# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OREGONIANS FOR FLOODPLAIN PROTECTION, 1015 15th St, NW, Suite 1000 Washington, DC 20005;<br><br>        Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF COMMERCE, 1401 Constitution Ave, NW, Washington, DC 20230, a department of the United States of America;<br><br>GINA RAIMONDO, 1401 Constitution Ave, NW, Washington, DC 20230, in her capacity as the Secretary of Commerce;<br><br>NATIONAL MARINE FISHERIES SERVICE, 1315 East-West Hwy, Silver Spring, MD 20910;<br><br>JANET COIT, 1315 East-West Hwy, Silver Spring, MD 20910, in her capacity as Assistant Administrator for National Marine Fisheries Service;<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, 2707 Martin Luther King Jr Ave, SE, Washington, DC 20528-0525, a department of the United States of America;<br><br>ALEJANDRO MAYORKAS, 2707 Martin Luther King Jr Ave, SE, Washington, DC 20528-0525, in his capacity as the Secretary of the Department of Homeland Security;<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, 500 C St, SW, Washington, DC 20024; and<br><br>DEANNE CRISWELL, 500 C St, SW, Washington, DC 20024, in her capacity as the Administrator for the Federal Emergency Management Agency;<br><br>        Defendants. | Civil Action No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.    INTRODUCTION

1.      This case arises from the U.S. Department of Commerce, National Oceanic and Atmospheric Administration ("NOAA"), National Marine Fisheries Service's ("NMFS") issuance of the Endangered Species Act ("ESA") Section 7(a)(2) Jeopardy and Destruction or Adverse Modification of Critical Habitat Biological Opinion and Section 7(a)(2) "Not Likely to Adversely Affect" Determination for the Implementation of the National Flood Insurance Program in the State of Oregon (the "Biological Opinion"), and the U.S. Department of Homeland Security, Federal Emergency Management Agency's ("FEMA") actions to implement the Biological Opinion's Reasonable and Prudent Alternative ("RPA").

2.      The Biological Opinion erroneously concludes, without adequate analysis or support, that FEMA's implementation of the National Flood Insurance Program ("NFIP") in Oregon is likely to jeopardize the continued existence of 16 ESA-listed anadromous fish species and Southern Resident killer whales and is likely to result in the destruction or adverse modification of designated or proposed critical habitat for the 16 anadromous fish species.  The Biological Opinion contains an equally erroneously six element RPA to FEMA's implementation of the NFIP.

3.      FEMA has begun implementing the Biological Opinion's erroneous RPA, first by providing notice to NFIP-participating communities in Oregon ("RPA Element 1"), and more recently by implementing interim measures ("RPA Element 2").  Regarding RPA Element 2, FEMA took final agency action in July 2024 when it: (1) announced the suspension of processing Letters of Map Revisions ("LOMRs") and Conditional Letters of Map Revisions ("CLOMRs") based on fill in Oregon within the action area for the Biological Opinion effective August 1, 2024; (2) directed all NFIP-participating communities in Oregon within the action area for the Biological

Opinion to select and begin implementing Pre-Implementation Compliance Measures by December 1, 2024; and (3) required those communities to begin collecting data demonstrating compliance by January 31, 2025 (collectively, "PICMs"). *See, e.g.*, Letter to Mary Faith Bell, Tillamook County, from Willie G. Nunn, Regional Administrator FEMA Region 10 (July 15, 2024). A copy of this letter is attached as **Exhibit A**.

4. There is nothing in the NFIP's existing statutory authority or regulations that authorizes FEMA to implement the RPA as issued or the PICMs. Instead, FEMA's efforts to implement the RPA, particularly RPA Element 2 through the PICMs, rely on a revised interpretation of a pre-existing NFIP regulation. 44 C.F.R. § 60.3(a)(2). FEMA now interprets this regulation to require NFIP-participating communities to not only "review proposed development to assure all necessary permits have been received from those governmental agencies from which approval is required by Federal or State law" as stated in the regulation, but also to ensure that any project in the floodplain either has no adverse effect on floodplain storage, water quality, or vegetation, or mitigates those effects to a "no net loss standard" to satisfy RPA Element 2 (hereinafter, the "De Facto Amendment"). Pursuant to this new interpretation, FEMA directed NFIP-participating communities in Oregon to select and implement one of the PICM pathways developed by FEMA. Further, as part of the PICMs, FEMA's decision to unilaterally suspend processing of LOMRs and CLOMRs within the action area for the Biological Opinion violates 44 C.F.R. § 65.9.

5. These new directives from FEMA to NFIP-participating communities are ultra vires conduct not authorized by the National Flood Insurance Act of 1968 ("NFIA"), 42 U.S.C. §§ 4001 et seq.; rely on substantive changes in interpretation and application of FEMA's existing regulations that were adopted and implemented without following the rulemaking procedures of

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706; fail to analyze the environmental impacts as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370m-12; and violate the U.S. Constitution Spending Clause Art. I, § 8, cl. 1, and the Tenth Amendment.

6.    Plaintiff seeks a declaration that FEMA's De Facto Amendment and implementation of the RPA through the PICMs in Oregon without completing the pre-requisite rulemaking and NEPA review violates the APA because they are in excess of FEMA's jurisdiction and authority under the NFIA, 42 U.S.C. §§ 4022 and 4012, and have been undertaken without observance of requisite procedures. 5 U.S.C. § 706. Plaintiff further seeks an injunction directing FEMA to suspend any implementation of its De Facto Amendment and/or any implementation of the RPA prior to completing the prerequisite APA rulemaking and NEPA environmental review.

7.    Plaintiff seeks a declaration that the Biological Opinion, including the RPA, which directs FEMA to change its implementation of the NFIP not only in Oregon, but nationwide, violates the APA because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id.* § 706(2)(A). Plaintiff further seeks an injunction directing NMFS to withdraw the Biological Opinion, including the RPA. Such relief is necessary to ensure that changes to the NFIP, proposed by NMFS and implemented by FEMA, are not imposed without a complete and reasoned analysis of the actual impacts of the NFIP on ESA-listed species and their designated critical habitat.

8.    Plaintiff seeks a declaration that the PICMs violate the U.S. Constitution because they exceed the federal government's limits under the Spending Clause and impermissibly commandeer NFIP-participating communities into enforcing the ESA in violation of the Tenth Amendment.

## II.    JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory judgment), and 2202 (injunctive relief).  The challenged agency actions of NMFS and FEMA are subject to this Court's review pursuant to the APA.  5 U.S.C. § 702.

10.    The APA allows this Court to hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law, *id.* § 706(2)(A); that is in excess of the statutory jurisdiction, authority or limitation, *id.* § 706(2)(C); and that is undertaken without observance of procedures required by law, *id.* § 706(2)(D).  The APA provides a cause of action for parties adversely affected by final agency action when "there is no other adequate remedy in a court." *Id.* § 704.  Plaintiff challenges final agency actions as defined by the APA.  *Id.*

11.    Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e) because a substantial part of the events giving rise to the claims occurred in this District, including final decisions by both NMFS and FEMA regarding the Biological Opinion's conclusion and the terms of the RPA; Plaintiff Oregonians for Floodplain Protection ("OFP") is incorporated in this District; the U.S Department of Commerce, NOAA, U.S. Department of Homeland Security, and FEMA, as well as many of the federal officials responsible for the challenged actions reside in this District; and implementation of the RPA will affect the NFIP nationwide, not just in Oregon.

## III.    PARTIES

12.    Plaintiff OFP is a non-profit corporation formed in the District of Columbia.  OFP's purpose is to support and advocate for sustainable floodplain development policies.  OFP is an association of industry trade associations, individual property owners in Oregon, and NFIP-

participating communities in Oregon.  Members of OFP have been and will continue to be directly and adversely affected by the Biological Opinion and FEMA's implementation of the RPA, including the PICMs.

13.    Several members of OFP are NFIP-participating communities in Oregon, including, but are not limited to, Tillamook County, Clatsop County, Columbia County, and the City of Warrenton.  NFIP-participating community members are being coerced to restrict and condition development within Special Flood Hazard Areas ("SFHAs") (commonly referred to as the floodplain) by the Biological Opinion and FEMA's current and ongoing implementation of the RPA, particularly the PICMs designed and implemented to satisfy RPA Element 2. Implementation of the RPA, and particularly the PICMs, will directly and negatively affect development patterns within their jurisdictions, require these communities to take actions that violate and/or are inconsistent with Oregon laws and regulations to maintain their participation in the NFIP, reduce their tax bases, expose them to financial liability to property owners, and limit development of properties owned by the communities within the floodplain.  FEMA has told these communities that if they do not comply with FEMA's direction to implement the PICMs, FEMA will take action to suspend them from the NFIP.  *See* Exhibit A.  If these communities are suspended from the NFIP, residents in their communities who rely on the NFIP for flood insurance will be forced to default on the terms and conditions of their federally backed mortgages that require flood insurance, the communities will no longer qualify for certain types of disaster relief under the Stafford Act, 42 U.S.C. § 5121 et seq., and the communities will no longer be eligible to receive federal funds for projects within their floodplains, *id.* § 4106(a).  Each of the NFIP-participating community members has significant portions of their jurisdictional land in the floodplain.

14.     Similarly, individual members of OFP own properties and businesses located within the floodplain within NFIP-participating communities in Oregon.  Those member property owners and businesses are being constrained by their local communities' implementation of the PICMs in order to continue to participate in the NFIP.  The development potential and value of their properties located in the floodplain have already been curtailed by NMFS's issuance of the Biological Opinion, and will be more significantly curtailed, and in some cases entirely eliminated, by FEMA's implementation of the PICMs.  Several members are in the midst of processing applications to develop their floodplain properties or have specific and imminent plans to develop their floodplain properties, which will be prohibited or at least substantially curtailed by their local community implementing the PICMs.

15.     OFP and its members are concerned about, and dedicated to protecting, the environment and the land use system developed in Oregon over the last 40 years.  Implementation of the development restrictions set forth in the RPA, particularly the PICMs, will undermine that land use system, forcing urban development to expand into areas that have been recognized and preserved as a combination of rural and resource lands, including agricultural lands and forestry lands, and limiting residential development despite an identified housing crisis.  Implementation of the development restrictions set forth in the RPA, particularly the PICMs, will upset the system that the State of Oregon and its local communities have worked diligently to develop and maintain to balance beneficial use and preservation of Oregon's lands.  Further, implementation of the PICMs as directed by FEMA will require NFIP-participating communities to violate several provisions of Oregon land use law, both procedural requirements (e.g., Oregon Measure 56, which requires landowner notification when a change in land-use laws might limit development) and substantive requirements (e.g., Or. Rev. Stat. 197a.400, which requires cities and counties to adopt

clear and objective standards, conditions and procedures regulating the development of housing, including needed housing, on land within an urban growth boundary).

16.    Further, several members of OFP have voluntarily participated in significant projects in the FEMA-designated floodplain aimed at restoring and preserving habitat for ESA-listed anadromous fish species in Oregon.  Those projects and the resulting benefits for ESA-listed species and habitat are not, however, acknowledged by NMFS in the Biological Opinion or FEMA in the implementation of the PICMs.

17.    Defendant U.S. Department of Commerce is a department within the U.S. government with the ultimate responsibility for implementing and enforcing compliance with the relevant provisions of the ESA.

18.    Defendant Gina Raimondo is sued in her official capacity as the Secretary of the U.S. Department of Commerce.  As the Secretary of Commerce, Ms. Raimondo is the highest-ranking official within the U.S. Department of Commerce and has ultimate responsibility for the administration and implementation of the ESA.

19.    Defendant NMFS is an office of the NOAA within the U.S. Department of Commerce that is charged with administering the ESA with respect to anadromous and marine species, including salmonids and killer whales.  NMFS has the responsibility to engage in ESA Section 7 consultation with other agencies to evaluate the effects of a proposed agency action on listed species under its jurisdiction.  The authority delegated to NMFS to administer and implement the ESA is subject to, and must be in compliance with, the applicable requirements of the ESA and the APA.

20.     Defendant Janet Coit is sued in her official capacity as the Assistant Administrator of NMFS.  As Assistant Administrator of NMFS, Ms. Coit is charged with administering the ESA, including consultation with federal agencies under Section 7(a)(2).

21.     Defendant U.S. Department of Homeland Security is a department within the U.S. government with the ultimate responsibility for the security of the United States.

22.     Defendant Alejandro Mayorkas is sued in his official capacity as Secretary of the U.S. Department of Homeland Security.

23.     Defendant FEMA is an agency of the U.S. Department of Homeland Security. FEMA is responsible for the implementation of the NFIP.  The authority delegated to FEMA to administer and implement the NFIP is subject to, and must be in compliance with, the applicable requirements of the U.S. Constitution, the NFIA, APA, and NEPA.

24.     Defendant Deanne Criswell is sued in her official capacity as the Administrator of FEMA.  As Administrator of FEMA, Ms. Criswell is charged with administering the NFIP.

### IV.     LEGAL BACKGROUND

**A.     The National Flood Insurance Act of 1968**

25.     The NFIP is a federal program administered by FEMA.  The NFIP was established by the passage of the NFIA.  42 U.S.C. § 4001 et seq.  The NFIA enables property owners in participating communities to purchase insurance protection against losses from flooding through the federal government, provided that their participating communities adopt certain floodplain management regulations that are designed to reduce future flood damages.  *Id.* § 4001(d).  The intent was to reduce future flood damage through community floodplain management ordinances and provide protection for property owners against potential losses through an insurance mechanism.  *Id.* § 4002(b).

26.     The scope and purpose of the NFIA is to protect people and property from flood hazards.  No provision under the NFIA authorizes FEMA to adopt measures for the benefit of threatened and endangered species that extend beyond the primary purpose of the NFIA, which is avoidance of flood damage and flood losses.

27.     The Flood Disaster Protection Act of 1973 and the Flood Insurance Reform Act of 1994, as amended, require those federal agencies that are responsible for overseeing federally regulated and insured lenders to mandate the purchase of flood insurance for properties located within the floodplain for the term of the loan.  Pub. L. No. 93-234, 87 Stat. 975 (1973); Pub. L. No. 103-325, Title V, 108 Stat. 2255 (1994); 42 U.S.C. § 4012a.  Further, these amendments made participation in the NFIP a pre-requisite to the receipt of certain disaster relief under the Stafford Act, and a pre-requisite to the receipt of federal funding for projects located in the floodplain.  42 U.S.C. § 4106(a).

28.     FEMA develops, and from time-to-time is required to revise, floodplain management criteria intended to reduce the amount of development exposed to floods, assist in reducing damage caused by floods, and "otherwise improve the long-range land management and use of flood-prone areas."  *Id.* § 4102(c)(4).  Nothing in the NFIP, however, authorizes FEMA to restrict or regulate development in the floodplain for purposes of protecting species or habitat.

29.     FEMA's floodplain management criteria are codified in federal regulations at 44 C.F.R. §§ 60.1-60.26.  Among FEMA's floodplain management criteria is 44 C.F.R. § 60.3(a)(2), which provides, in relevant part, that NFIP-participating communities shall:

> Review proposed development to assure that all necessary permits have been received from those governmental agencies from which approval is required by Federal or State law, including section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1334.

30.     The NFIP was created as a Federal-State-Local partnership that depends on the states and local governments to regulate land use consistent with FEMA's minimum criteria.  If a community has not adopted floodplain management criteria consistent with FEMA's regulations, the community, and its residents, will not be able to obtain federally backed flood insurance, disaster assistance under the Stafford Act, and federal funding for projects in the floodplain.  42 U.S.C. §§ 4022(a)(1), 4106; 44 C.F.R. § 60.1(a).

31.     As FEMA has represented in other litigation:

> The power to regulate development in the floodplain, including requiring and approving permits, inspecting property, and citing violations, is granted to communities under a State's police powers.  The Constitution reserves such police powers to the States, U.S. Const. Amend. X, and the States delegate this power to their respective political subdivisions. *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905).  To achieve the NFIP's public interest mandate to encourage sound land use by minimizing exposure of property to flood losses, the NFIP depends on participating states and their political subdivisions to promulgate and administer local floodplain management ordinances pursuant to their role as the local land use authority. *Nat'l Wildlife Fed'n v. FEMA*, No. C11-2044-RSM, 2014 WL 5449859, at *11 (W.D. Wash. Oct. 24, 2014) (FEMA "is not a land-use authority and it can only provide guidance, technical assistance, require reporting, and institute enforcement actions. . . .").

Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. at 3-4, *Nw. Env't Def. Ctr. v. FEMA*, No. 3:23-cv-01335-SI (D. Or. Sept. 19, 2024), ECF No. 20. A copy of this pleading is attached as **Exhibit B**.

32.     If FEMA modifies its floodplain management criteria, all NFIP-participating communities must implement those changes to maintain eligibility to participate in the NFIP.  Nearly all counties and cities in Oregon with any mapped floodplain within their jurisdictions are enrolled in the NFIP.

33.     FEMA oversees communities' participation in and eligibility for the NFIP in an ongoing manner.  FEMA conducts community visits and contacts to ensure proper implementation

of NFIP requirements.  A community's failure to implement and enforce NFIP minimum criteria can result in probation or suspension from the NFIP, which would make federal flood insurance and other federal benefits unavailable in that community.  44 C.F.R. § 59.24.

34.    FEMA also implements a Community Rating System ("CRS"), a separate, voluntary program to encourage local communities to adopt floodplain management regulations that exceed FEMA's minimum development standards.  42 U.S.C. § 4022(b).  Under the CRS, insured parties in NFIP-participating communities that have adopted floodplain management regulations that are more restrictive than FEMA's minimum development standards set forth in 44 C.F.R. Parts 59 and 60 are rewarded with lower insurance rates.  *Id.* § 4022(b)(2).

35.    FEMA develops and revises maps and other information that identify flood-prone areas as part of its implementation of the NFIP.  *Id.* § 4101.  Certain maps, known as Flood Insurance Rate Maps, identify various categories of flood hazard areas, including floodplains and regulatory floodways, in which the NFIP's minimum development standards apply.  *See* 44 C.F.R. pt. 65.

## B.    The Endangered Species Act

36.    Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] to provide a program for the conservation of such endangered species and threatened species[.]" 16 U.S.C. § 1531(b).

37.    Section 7(a)(2) of the ESA mandates an interagency consultation process to evaluate potential impacts to listed species and designated critical habitat before a federal agency may authorize, fund, or take any discretionary action.  *Id.* § 1536(a)(2).  The consultation process begins when a federal "action agency" (here FEMA) requests that NMFS or the U.S. Fish and Wildlife Service ("FWS") (each, a "Service" and collectively, the "Services"), or both, review a

proposed action that may affect a listed species or destroy or adversely modify critical habitat.  *Id*.

The Services have promulgated regulations regarding their implementation of Section 7.  50 C.F.R.

pt. 402 (2016).[1]  The Services also have published various guidance documents on the ESA Section

7 consultation process, including the Services' Endangered Species Consultation Handbook

(1998),  *available    at*    https://www.fws.gov/sites/default/files/documents/endangered-species-

consultation-handbook.pdf.

> 38.    The consultation process usually begins as informal consultation.  If it appears that

the agency's action may affect a listed species or destroy or adversely modify critical habitat, that

agency may then prepare a biological assessment to assist in its determination of the project's

effect on a species or critical habitat.  If the action agency, after discussions with the Service(s),

determines that the proposed action is not likely to adversely affect any listed species or destroy

or adversely modify designated critical habitat, and the Service(s) concur(s), the informal

consultation is complete, and the proposed project moves ahead.

> 39.    If it appears that the agency's action is likely to adversely affect a listed species or

destroy or adversely modify critical habitat, the Service will prepare a biological opinion regarding

whether the proposed activity will jeopardize the continued existence of a listed species or destroy

or adversely modify critical habitat.  To "*Jeopardize the continued existence of* means to engage

in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the

likelihood of both the survival and recovery of a listed species in the wild by reducing the

reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  "*Destruction or*

*adverse modification* means a direct or indirect alteration that appreciably diminishes the value of

---

[1] The regulations effective at the time of issuance of the Biological Opinion were the 2016 regulations.  Interagency Cooperation-Endangered Species Act of 1973, As Amended; Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed. Reg. 7214 (Feb. 11, 2016).

critical habitat for the conservation of a listed species." *Id.*  The biological opinion must, among other things, be based on "the best scientific and commercial data available" and must "give appropriate consideration to any beneficial actions . . . taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

40.     To fulfill their ESA Section 7 duties for an action that an action agency proposes to implement, fund or authorize, the Services must evaluate "the effects of the action and cumulative effects on the listed species or critical habitat."  50 C.F.R. § 402.14(g)(3).  "*Effects of the action*" refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action that will be added to the environmental baseline.  *Id.* § 402.02.  "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.*  "*Cumulative effects* are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

41.     In making a determination on whether an action will result in jeopardy, the Service begins by looking at the current status of the species, or "environmental baseline."  The Services define the "environmental baseline" as including:

> the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

*Id.*

42.     The biological opinion must include a summary of the information upon which the opinion is based, a "detailed discussion of the effects of the action on listed species or critical

habitat," and an opinion as to whether the action is "[l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat . . . ." *Id.* § 402.14(h)(1).

43.    If a proposed agency action is likely to jeopardize a listed species or adversely modify designated critical habitat, the Service must propose an RPA that will avoid those outcomes.  16 U.S.C. § 1536(b)(3)(A).  An RPA is one way—but not the only way—that an action agency may avoid jeopardy or adverse modification or destruction of critical habitat.

44.    An RPA must: (1) be capable of being implemented in a manner consistent with the intended purpose of the action; (2) be consistent with the scope of the action agency's legal authority and jurisdiction; (3) be economically and technologically feasible; and (4) avoid the likelihood of jeopardy to a species or the adverse modification or destruction of critical habitat. 50 C.F.R. § 402.02.  Further, as with the rest of the biological opinion, the RPA must be based on "the best scientific and commercial data available" and must "give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

### C.    The National Environmental Policy Act

45.    NEPA was enacted in 1970.  NEPA directs all federal agencies to assess the environmental impacts of proposed federal actions that significantly affect the quality of the environment.  42 U.S.C. § 4332(2)(C)(ii).  NEPA requires that all agencies "utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment."  *Id.* § 4332(2)(A).

46.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies.[2]  *Id.* § 4342; 40 C.F.R. §§ 1500.1-1508.08.  In addition, each federal agency is required to develop NEPA procedures that supplement the CEQ regulations.  40 C.F.R. § 1507.3.

47.     NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

48.     An EIS is a "detailed statement" that describes (1) the "environmental effects of the proposed agency action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) any "irreversible or irretrievable commitment of Federal resources which would be involved in the proposed action should it be implemented."  *Id.*

49.     For proposed agency actions that do not have a reasonably foreseeable significant effect on the quality of the human environment, or the significance of the effect is unknown, and a categorical exclusion does not apply, agencies shall prepare an environmental assessment ("EA").  *Id.* § 4336(b)(2).  An EA is a "concise public document" that must set forth "the basis of such agency's finding of no significant impact or determination that an [EIS] is necessary." *Id.*

50.     Whether the agency prepares an EA or an EIS, or both, NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of

---

[2] *Marin Audubon Soc'y v. Fed. Aviation Admin.*, No. 23-1067, 2024 WL 4745044 (D.C. Cir. Nov. 12, 2024), held that CEQ regulations implementing NEPA are ultra vires, but the Court did not vacate those regulations.  As of the filing of this Complaint, the issue of the validity of the CEQ NEPA implementing regulations remains under consideration by the U.S. Court of Appeals for the D.C. Circuit.

action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(H).

51.    NEPA establishes a baseline requirement for federal agencies both to consider the impacts of federal actions on the environment in their decision making, and to make that analysis available for public review.  The purpose of NEPA is to ensure that an agency "has adequately considered and disclosed the environmental impact of its actions." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citation omitted).  An EIS requires the agency take a "hard look" of the environmental consequences of its proposed actions before taking such action.

**D.    The Administrative Procedure Act**

52.    Congress enacted the APA in 1946, prescribing the process by which federal agencies develop and issue regulations and other agency actions such as policy statements, licenses and permits.

53.    Before adopting a rule, the APA requires federal agencies to publish notice of the proposed rule in the Federal Register, and after such notice, give interested persons an opportunity to participate in the rulemaking.  5 U.S.C. § 553.

54.    The APA defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." *Id.* § 551(4).

55.    An agency must follow the procedures of the APA before implementing an amendment to an existing regulation.  An agency may not avoid the procedures of the APA by making an amendment and calling that amendment mere "guidance" that interprets the existing regulation.

56.    The APA also authorizes courts to review final agency action and grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . ." *Id.* § 702.  An agency action is final when the action marks the consummation of the agency's decision-making process, and the action is one by which rights or obligations have been determined or from which legal consequences will flow.  *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016).  The APA mandates that a court hold unlawful and set aside such actions, findings, and conclusions when they are: (a) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A); (b) in excess of statutory jurisdiction, authority or limitation, *id.* § 706(2)(C); or (c) without observance of procedures required by law, *id.* § 706(2)(D).

57.    Biological opinions issued pursuant to Section 7 of the ESA, including the Biological Opinion regarding FEMA's implementation of the Oregon NFIP, are subject to judicial review under the APA.  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

58.    Failures to abide by the requirements of the NFIA, NEPA, and the APA are subject to judicial review under the APA.  5 U.S.C. §§ 702, 706.

### E.    The U.S. Constitution

59.    Article I, § 8, cl. 1 of the U.S. Constitution grants Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States."

60.    Congress' power to condition the receipt of federal funds is subject to several limitations.  First, the legislation must be made in pursuit of the general welfare.  Second, it must impose unambiguous conditions on states, so they voluntarily and knowingly accept funds with an understanding of the consequences of doing so.  Third, the legislation's conditions must be related

to federal interest in the program.  Fourth, the legislation must not induce unconstitutional action.

*South Dakota v. Dole*, 483 U.S. 203, 211 (1987).

61.    The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

62.    More specifically, in the context of the Spending Clause, the Tenth Amendment represents a prohibition against "impermissible compulsion" or "commandeering," i.e., "when pressure turns into compulsion." *Id.* (citation omitted).  Nor can federal officials "forc[e] state governments to absorb the financial burden of implementing a federal regulatory program" or to put them "in the position of taking the blame for its burdensomeness and for its defects." *Printz v. United States*, 521 U.S. 898, 930 (1997) (citation omitted).

## V.    ALLEGATIONS

### A.    The Prior Litigation and the Oregon NFIP Consultation

63.    On June 25, 2009, Audubon Society of Portland, Northwest Environmental Defense Center, the National Wildlife Federation, and the Association of Northwest Steelheaders filed suit against FEMA for failing to consult on the effects of the NFIP on threatened and endangered species in Oregon.  In July 2010, FEMA reached a settlement with the plaintiffs under which FEMA agreed to initiate ESA consultation regarding the effects of the implementation of the NFIP in Oregon on certain ESA-listed species.

64.    On July 18, 2011, FEMA provided a letter to NMFS requesting formal consultation under the ESA regarding the implementation of the NFIP in the State of Oregon.  FEMA initiated formal consultation with NMFS on August 15, 2012.  As part of its consultation request, FEMA provided to NMFS its *Program Level Biological Assessment for the National Floodplain Insurance Program Oregon State*, *available at* https://www.fema.gov/sites/default/files/

documents/fema.gov_or-nfip-pba-final-version_201303.pdf ("Biological Assessment"), in February 2013.

65.     On April 14, 2016, NMFS issued a Biological Opinion on the impacts of the NFIP in Oregon on 17 ESA-listed anadromous fish species and Southern Resident killer whales. In the Biological Opinion, NMFS determined that the implementation of the NFIP in Oregon as proposed by FEMA would jeopardize the survival and recovery of 16 of the 17 ESA-listed anadromous fish species considered in the Biological Opinion and Southern Resident killer whales, and would destroy or adversely modify the designated or proposed critical habitat for the 16 anadromous fish species.[3]

66.     NMFS issued a six element RPA to FEMA's implementation of the NFIP for the 16 anadromous listed species and Southern Resident killer whales for which it found jeopardy. RPA Element 1 directs FEMA to give notice of NMFS's conclusions in the Biological Opinion and the terms of the RPA to the Oregon NFIP-participating communities. Biological Opinion at 277-78. FEMA implemented RPA Element 1 when it sent a letter to Oregon NFIP-participating communities on June 13, 2016.

67.     Element 2(A) directs FEMA to require that all development in the SFHA be mitigated to achieve no net loss of natural floodplain function, and sets forth several mitigation ratios for compensatory storage, vegetation removal, and placement of impervious surface

---

[3] Plaintiff OFP (along with others) previously filed a challenge to the Biological Opinion and FEMA's efforts to implement its RPA in 2017 in *Oregonians for Floodplain Protection v. U.S. Dep't of Commerce*, 334 F. Supp. 3d 66 (D.D.C. 2018). This Court dismissed this prior suit on September 21, 2018, on the grounds that the Plaintiffs had not established standing, and their claims were not ripe because FEMA had not yet taken any action to implement the RPA from the Biological Opinion. *Id.* at 74. Since then, FEMA has taken a final agency action through implementation of the PICMs designed to satisfy Element 2 of the RPA. *See* Exhibit A. As a result, Plaintiff's claims are now ripe, and they are injured by FEMA's implementation of the PICMs as set forth in this Complaint.

applicable to development within the floodplain irrespective of the actual effects of the development. Element 2(B) directs FEMA to require NFIP-participating communities to adopt a "riparian buffer zone" ("RBZ") and to prohibit all development in the RBZ other than open space, habitat restoration, activities that result in a beneficial gain for the species or habitat, and activities that will have no adverse effects on listed species or habitat. Further, Element 2 directs FEMA to revise its map revision procedures to decline all floodplain map amendments for which the applicants fail to demonstrate that all impacts of development to natural floodplain functions have been avoided or mitigated, or where the proposed development may adversely affect natural floodplain functions. FEMA began implementing RPA Element 2 in July 2024 when it announced the PICMs.

68.    RPA Element 3 directs FEMA to revise its mapping protocols nationwide and to map erosion prone areas under the NFIP. RPA Element 4 directs FEMA to modify the NFIP floodplain management criteria nationwide, including to adopt an "ESA performance standard." RPA Element 5 directs FEMA to collect data from NFIP-participating communities and to document and report impacts of floodplain development. RPA Element 6 directs FEMA to enforce the amended floodplain management criteria. FEMA is currently evaluating how it will implement these RPA Elements 3-6.

69.    NMFS set a series of deadlines in the Biological Opinion for each element of the RPA. For example, the Biological Opinion set March 15, 2018, as the deadline for implementation of the Interim Measures set forth in Element 2, and January 1, 2021, as the deadline for implementation of any components of the RPA that FEMA determines require regulatory revisions. Biological Opinion at 277.

70.     On October 5, 2018, in the Disaster Recovery Reform Act, Congress extended all the deadlines for RPA implementation by three years.  Pub. L. No. 115-254, § 1246, 132 Stat. 3185, 3469 (2018).

**B.     Substantive Deficiencies in the Biological Opinion**

71.     The Biological Opinion contains numerous deficiencies that render the jeopardy and adverse modification or destruction determinations, as well as the RPA, in violation of the ESA and arbitrary and capricious or otherwise not in accordance with the law.

72.     The Biological Opinion misconstrues the scope of the agency action.  The NFIP is a flood insurance program.  It does not authorize floodplain development.  FEMA has repeatedly explained that private floodplain development, not the NFIP, causes changes to the pre-existing condition of the floodplain, if any.

73.     The Biological Opinion fails to consider the correct environmental baseline.  In particular, in contravention of its own regulations, NMFS failed to incorporate required factors into the environmental baseline, including

> the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

50 C.F.R. § 402.02.

74.     The Biological Opinion fails to demonstrate or document how the NFIP causes floodplain development, or to identify which floodplain development NMFS believes is caused by the NFIP.  Instead, the Biological Opinion's effects analysis wrongly attributes *all* development within the floodplain, and the impacts thereof, to the NFIP, including wholly private development that is not insured through the NFIP and development that predated the NFIP.

75.    The Biological Opinion evaluates only the minimum development standards set forth in 44 C.F.R. §§ 60.1-60.6 and fails to consider the additional and more restrictive floodplain development standards adopted by NFIP-participating communities to participate in the NFIP and which FEMA thereafter enforces as the minimum standards within the adopting community. *See* 44 C.F.R. §§ 59.2(b), 59.22(a)(3), 60.1(d).

76.    The Biological Opinion fails to take into consideration the existing conditions in Oregon's floodplains, including existing developed and degraded conditions; fails to differentiate between the effects of development of unaltered areas as compared to the effects of redevelopment of previously developed areas; and fails identify areas of development that occurred prior to the implementation of the NFIP and prior to the initiation of the subject ESA consultation.

77.    The Biological Opinion fails to differentiate between alleged direct and indirect effects of the NFIP on any listed species or designated critical habitat. To the extent private floodplain development is an indirect effect of the NFIP, the Biological Opinion fails to limit its effects analysis to indirect effects that are reasonably certain to occur.

78.    The Biological Opinion both attributes the effects of private floodplain development to the NFIP and also considers those effects as "cumulative effects." As a result, NMFS "double counts" the effects of floodplain development on listed species or designated critical habitat in conducting its analysis. Further, in considering private floodplain development as a "cumulative effect," the Biological Opinion fails to limit its analysis of cumulative effects to those that are reasonably certain to occur.

79.    The Biological Opinion fails to include any reasonable basis for the conclusion that FEMA's implementation of the NFIP in Oregon is likely to cause particular impacts to the listed species or designated critical habitat. Further, the Biological Opinion fails to consider the

probability of any given impact.  The Biological Opinion assumes that any and all *possible* impacts of floodplain development will occur with every development project and will be 100% attributable to the NFIP, regardless of the actual or probable impacts of any given development and the unique circumstances of such development.

80.    In the Biological Opinion, NMFS failed to provide a reasonable evidentiary basis for the Biological Opinion's jeopardy conclusion.  In particular, the Biological Opinion fails to identify the magnitude of any loss or degradation of aquatic systems, the species populations' ability to tolerate any such impacts, or how any impacts will considerably or materially reduce the likelihood of survival or recovery.

81.    The Biological Opinion fails to provide a reasonable basis for the conclusion that FEMA's implementation of the NFIP destroys or adversely modifies critical habitat because the evidence does not demonstrate that any adverse effects will "considerably reduce" the value of critical habitat.

82.    NMFS adopted an RPA that is in violation of the ESA and its implementing regulations.  The RPA is not within the scope of FEMA's statutory authority under the NFIA.  FEMA has repeatedly explained to NMFS that implementation of the RPA is not within its authority.  *See, e.g.*, Letter from Roy E. Wright, FEMA Deputy Associate Administrator for Mitigation, to William Stelle, NMFS Regional Administrator (May 29, 2014); Letter from Mark Carey, FEMA Mitigation Division Director, to Kim Kratz, Ph.D., NMFS Assistant Regional Administrator (Jan. 14, 2015); Letter from Mark Carey, FEMA Mitigation Division Director, to Kim Kratz, Ph.D. (June 3, 2015); Letter from Michael M. Grimm, FEMA Assistant Administrator for Mitigation, to Kim Kratz, Ph.D., NMFS Assistant Regional Administrator (May 4, 2016).

NMFS has disregarded FEMA's contrary interpretation of the limits on its authority and misapplied tenants of statutory construction in construing the NFIA.

83.     RPA Elements 2, 4, and 5 are not within FEMA's legal authority because their implementation depends on actions by third parties.  Elements 2 and 4 depend on NFIP-participating communities taking separate actions to amend their flood hazard development regulations to implement the changes set forth in those RPA Elements.  Some of the changes mandated by FEMA would require NFIP-participating communities to violate Oregon state law. Element 5 depends on NFIP-participating communities providing information regarding issued floodplain permits that is not otherwise required by the NFIP.

84.     The RPA is not economically and technologically feasible.  The Biological Opinion did not analyze the actual costs to FEMA of implementing the RPA or FEMA's ability to bear those costs.

85.     The Biological Opinion also fails to consider the ability of NFIP-participating communities to implement the RPA consistent with Oregon laws and regulations or communities' ability to bear the costs of that implementation.  RPA Elements 2 and 4 will require NFIP-participating communities to complete separate public administrative processes to amend their existing flood hazard development regulations.  Some of the proposed amendments are inconsistent with existing requirements of Oregon laws. Further, the amendment processes are typically expensive and time consuming, requiring public notice, staff analysis, and one or more public hearings.  RPA Element 5 will require NFIP-participating communities to collect and report data regarding permits for development in the floodplain.

86.     The Biological Opinion fails to adequately explain how the RPA will avoid jeopardy to the species or destruction or adverse modification of critical habitat.

C.      **FEMA's Implementation of the RPA**

87.      FEMA has begun implementing the RPA.

88.      Consistent with RPA Element 1, on June 13, 2016, FEMA Region X sent a letter to NFIP-participating communities in Oregon notifying those communities of the Biological Opinion, alleging the communities' responsibilities under the Biological Opinion and RPA, and explaining FEMA's intent to implement the RPA.  Biological Opinion at 277-78; *see* Letter from Mark Carey, FEMA Region X Mitigation Division Director, to NFIP-participating communities in the State of Oregon (June 13, 2016).

89.      In December 2018, FEMA announced that it would not pursue implementation of the interim RPA (RPA Element 2) requirements and, instead, would develop an implementation plan for the non-interim RPA elements.  Memorandum from Willie Nunn, Regional Administrator, FEMA Region 10, to David Maustad Senior NFIP Official, Resilience Division, *Documentation of Decision-Making Rationale for the Implementation of interim Endangered Species Act compliance requirement for NFIP participating communities in Oregon* (Nov. 27, 2023).

90.      On October 5, 2021, FEMA advised NMFS that it had completed its draft Oregon Implementation Plan for NFIP-ESA integration and that its next step would be to make a determination about the appropriate level of NEPA analysis required.  The Draft Implementation Plan covers the NEPA analysis required for the non-interim RPA elements (RPA Elements 3-6).  Notably, the Draft Implementation Plan *does not* cover RPA Element 2 (interim measures) and FEMA's requirement that NFIP-participating communities must implement a PICM pathway.

91.      On March 6, 2023, FEMA published a notice of intent to prepare an EIS pursuant to NEPA regarding the Draft Implementation Plan. Notice of Intent To Prepare an Environmental Impact Statement for Oregon, 88 Fed. Reg. 13,841 (Mar. 6, 2023).  As FEMA explained, it "expects the proposed action to potentially significantly impact communities, individuals, and

businesses that intend on developing in the floodplain." *Id*. at 13,843. FEMA determined that the Draft Implementation Plan would cause extensive change in land use or commitment of large area of land; the environmental impact is likely to be controversial; and the action is one of several actions underway or planned for an area, and the cumulative impact of these actions is considered significant. *Id.* FEMA determined that an EIS was required. *Id.* at 13,841. The Draft Implementation Plan does not touch on RPA Element 2, and FEMA has not conducted any NEPA analysis regarding the PICMs.

92.     Despite having not yet completed NEPA, FEMA initiated implementation of RPA Element 2 through the PICMs beginning in July 2024.

**D.     Overview of PICMs**

93.     Despite having previously stated that it would not take any action to implement RPA Element 2, FEMA announced in July 2024 that NFIP-participating communities would be required to select and implement a PICM pathway to satisfy the provisions of RPA Element 2 pending FEMA's issuance of its Final Implementation Plan, expected in 2026. FEMA sent letters to NFIP-participating cities and counties in Oregon stating that they would need to implement a PICM pathway to continue to participate in the NFIP. *See* Exhibit A.

94.     As part of the PICMs, FEMA announced that it would suspend processing CLOMRs and LOMRs beginning August 1, 2024, and continuing through issuance of the Final Implementation Plan. *See id.*

95.     The PICMs outline three options for NFIP-participating communities: Pathway 1 is to adopt the PICMs' model floodplain management ordinance that considers impacts to fish habitat and requires mitigation to a no net loss standard; Pathway 2 is to review individual development proposals and require permit-by-permit habitat mitigation to achieve no net loss

using "Floodplain Habitat Assessment and Mitigation" guidance from FEMA; and Pathway 3 is to prohibit all new development in the floodplain. *See id.*

96.    FEMA's decision to implement the PICMs constitutes final agency action as it directs NFIP-participating communities that they "must" select and begin implementing one of the PICM pathways by December 1, 2024. For any communities that do not choose a PICM pathway by December 1, 2024, FEMA will default those communities to Pathway 2 for permit-by-permit habitat assessment and mitigation. Thereafter, beginning in January 2025, FEMA is requiring NFIP-participating communities to report their floodplain development activities to FEMA, including documenting implementation of their selected PICM pathway. If communities do not comply, they are subject to enforcement actions and suspension pursuant to the NFIA and associated regulations. *See* 44 C.F.R. § 59.24(b)-(c); Declaration of John Graves in Support of Defendant's Motion for Summary Judgment (filed as Pre_Implementation-0018670), *Nw. Env't Def. Ctr. v. FEMA*, No. 3:23-cv-01335-SI (D. Or. June 13, 2024), ECF No. 14 ("Graves Decl.").[4] FEMA considers the PICMs to "constitute a reviewable, final agency action based on the reasoning in *Bennett*, 520 U.S. at 177-79." No. 3:23-cv-01335-SI, ECF No. 20 at 23 (FEMA's Memorandum in Support of Motion for Summary Judgment).

97.    Development in floodplains and in surrounding areas will be restricted as a result of the implementation of the PICMs. Limitations on development within floodplains may redirect development to other areas, namely on lands outside of the mapped floodplain. Both the

---

[4] On September 14, 2023, Northwest Environmental Defense Center, et al., filed a complaint in the U.S. District Court for the District of Oregon seeking to compel FEMA to immediately implement all of the remaining elements of the RPA. Compl., *Nw. Env't Def. Ctr. v. FEMA*, No. 3:23-cv-01335-SI (D. Or. Sept. 14, 2023), ECF No. 1. FEMA first outlined its proposed PICM in the Declaration of John Graves submitted on June 6, 2024, as part of that suit.

restrictions on development within the floodplain and potential inducement to development outside the floodplain will have impacts on the natural and human environment.

98.     FEMA has repeatedly stated that it is not a permitting or land use authority.  FEMA interprets its own authority under the NFIA as limited, and has explained that the NFIA does not give FEMA the authority to regulate privately funded development on private land, nor does it give FEMA the authority to adopt measures to protect listed species or their habitat.  *See* Graves Decl. ¶¶ 9-12. Nevertheless, by implementing the PICMs, which prohibit or severely restrict development in the floodplain, FEMA is dictating to NFIP-participating communities—and through the communities to property owners—how their land may be used and developed.

99.     The PICMs also unilaterally suspend the processing of certain LOMRs and CLOMRs.  On August 1, 2024, FEMA announced that it will "implement a delay in the processing of two types of Letter Letters of Map Changes in the Oregon NFIP-ESA Implementation Plan area, specifically Letters of Map Changes associated with the placement of fill in the floodplain: Conditional Letter of Map Revision Based on Fill (CLOMR-F) and Letter of Map Revision Based on Fill (LOMR-F) requests." *See* Exhibit A at 2. This is in derogation of the NFIA and the requirements of 44 C.F.R. § 65.9, which states that "Upon receipt of a revision request, the Federal Insurance Administrator shall mail an acknowledgment of receipt of such request to the CEO. Within 90 days of receiving the request with all necessary information, the Federal Insurance Administrator shall notify the CEO" of different determinations, none of which permit FEMA to suspend processing LOMRs and CLOMRs.

### E.     FEMA's De Facto Amendment

100.    The NFIP's minimum floodplain development criteria were originally promulgated in 1976.  41 Fed. Reg. 46,975 (Oct. 26, 1976).  44 C.F.R. § 60.3(a)(2) states that NFIP-participating communities must "review proposed development to assure that all necessary permits have been

received from those governmental agencies from which approval is required by Federal or State law, including section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1334."

101.   FEMA provided its Biological Assessment of the Oregon NFIP to NMFS as part of its request to initiate formal ESA consultation.  In the Biological Assessment, FEMA set forth a new statement of the requirements of 44 C.F.R. § 60.3(a)(2).  Specifically, FEMA stated: "NFIP communities must ensure that permit applicants have demonstrated compliance with the ESA before issuing a floodplain development permit per the NFIP regulations (44 C.F.R. 60.3(a)(2))." Biological Assessment at 2-37.  FEMA further explained this new requirement as follows: "if the potential of a 'take' exists for a proposed development permit within the SFHA, the community has a requirement under Part 60.3.a.2 to ensure the ESA 'permit for take' has been obtained from NMFS." *Id.* at 2-40.  FEMA identified a "permit for take" as either an ESA Section 10 permit or "any Incidental Take Statement issued to federal agencies under Section 7 of the ESA . . . ." *Id.* at 2-40 to 2-41.

102.   Prior to the Biological Assessment, FEMA had not interpreted 44 C.F.R. § 60.3(a)(2) as requiring an NFIP-participating community to require a floodplain development permit applicant to obtain an ESA "permit for take" (ESA Section 10), or otherwise to demonstrate compliance with the ESA prior to issuing a floodplain development permit.

103.   In the Biological Opinion, NMFS referred to FEMA's effort to revise its interpretation of 44 C.F.R. § 60.3(a)(2) as requiring NFIP-participating communities to require floodplain permit applicants to obtain an "ESA permit" or otherwise comply with the ESA as "a significant flaw."  Biological Opinion at 40.  NMFS explained that ESA Section 10 permits are elective, not required, and consequently do not fall within the purview of 44 C.F.R. § 60.3(a)(2).

*Id.* Further, Incidental Take Statements ("ITSs") are available only as a part of an ESA Section 7 consultation. Private floodplain development projects that do not require or depend on either any federal authorization or federal funding do not require a Section 7 consultation. As a result, an ITS is not a "required permit" for private floodplain development projects that do not require or depend on either any federal authorization or federal funding.

104.    Since NMFS's issuance of the Biological Opinion, FEMA has further reinterpreted 44 C.F.R. § 60.3(a)(2) as part of directing NFIP-participating communities to select and implement the PICMs. As part of its direction to NFIP-participating communities, FEMA explained its authority to require communities to implement the PICMs as follows:

> Under 44 CFR 60.3(a)(2) a community must ensure that all other Federal, State and Local permits have been obtained when they are permitting a project in the SFHA. As such a local community must ensure that a "take permit" under section 10 of the ESA is not required. The NMFS Biological Opinion on the implementation of the NFIP in Oregon has determined that developing a floodplain may affect the three key floodplain functions and potentially cause take.
>
> Therefore, *a community must ensure that any project that has an adverse effect on those three functions mitigates for the effect to a "no net loss" standard*. FEMA has been authorized take under the RPAs in the NMFS BiOp on the implementation of the NFIP in Oregon. A community participating in the NFIP can use the NFIP take authorization for coverage as long as they are abiding by the NFIP-ESA performance standards.

Oregon National Flood Insurance Program Endangered Species Act Integration, Pre-Implementation Compliance Measures Basics at 2 (Sept. 2024) (emphasis added) (attached hereto as **Exhibit C**).

### F.    The RPA Impacts OFP's Members

105.    The RPA, including FEMA's implementation of the PICMs, has harmed and continues to harm OFP's members as it has clouded OFP's members' properties, harmed OFP's members' property values, and limited their ability to market their properties for development

because: (1) potential buyers are concerned that they will be subject to restrictions on development; and (2) potential buyers are on notice that their development may result in ESA liability because the Biological Opinion finds that floodplain development may cause take of ESA-listed species. The injury is concrete and particularized to OFP's members because they own property in the floodplain, and they have well established plans to develop that property or to market it for development purposes. Additionally, OFP members that are NFIP-participating communities are harmed by the RPA because it has significantly curtailed these jurisdictions' ability to implement their land use priorities and to comply with Oregon state law.

106. FEMA's PICMs also violate constitutional principles. The PICMs exceed the powers conferred under the Spending Clause because they impose conditions that NFIP-participating communities have not voluntarily and knowing accepted, impose conditions related to the implementation of the ESA are not germane to the federal interest in the NFIP, and induce unconstitutional action by violating the Tenth Amendment's anticommandeering principles.

107. The PICMs violate the Tenth Amendment by "direct[ing] the functioning" of state and local governments and requiring NFIP-participating communities to govern according to Congress' instructions, *Printz*, 521 U.S. at 932, and must be enjoined. The PICMs thrust the duty of implementing the Biological Opinion and RPA Elements on NFIP-participating communities as opposed to FEMA itself. Federal officials may not "forc[e] state governments to absorb the financial burden of implementing a federal regulatory program" or to put them "in the position of taking the blame for its burdensomeness and for its defects." *Id.* at 930 (citation omitted).

108. FEMA's failure to comply with APA rulemaking procedures prior to implementing the PICMs and its De Facto Amendment has denied Plaintiff and its members their right to notice and the opportunity to participate before FEMA makes significant changes to the NFIP. The

changes implemented by FEMA without the required APA rulemaking process also subject Plaintiff and its members to additional costly obligations before they may receive permits to develop their properties, in many instances rendering their developments impossible and/or financially non-viable.

109.    FEMA's failure to comply with NEPA prior to implementing the PICMs and De Facto Amendment undermines and injures Plaintiff's and its members' recreational, aesthetic, scientific, cultural, spiritual, and other interests and activities by altering the floodplain management criteria and floodplain mapping processes without taking a hard look at environmental impacts of those changes or reasonable alternatives.  If FEMA were directed to comply with NEPA, it could adopt alternatives that would lessen, and thus redress, Plaintiff's and its members' injuries.

110.    FEMA's failure to comply with NEPA also causes Plaintiff and its members procedural and informational injuries.  If FEMA had complied with NEPA before demanding implementation of the PICMs and its De Facto Amendment, the process would have generated additional information, and Plaintiff and its members would have had access to this information, improving their ability to participate in decision-making and to suggest possible alternatives.

111.    A court order requiring FEMA to limit its actions to the scope of the NFIA when amending 44 C.F.R. § 60.3(a)(2) or before implementing the RPA would remedy Plaintiff's and its members' procedural and substantive injuries.

112.    A court order requiring FEMA to comply with its procedural and substantive obligations under the APA and NEPA before amending 44 C.F.R. § 60.3(a)(2) or before implementing the RPA, most immediately the PICMs, would remedy Plaintiff's and its members' procedural and substantive injuries.

113.    A court order finding that the Biological Opinion, including the RPA, is in violation of the ESA and is invalid as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law under the APA would redress Plaintiff's and its members' injuries by ensuring that environmental objectives of the ESA are pursued in light of the actual impacts of the NFIP and with appropriate reference to FEMA's authority and economic consequences.

114.    A court ordering finding that FEMA's imposition of the PICMs violate the U.S. Constitution and enjoining the implementation of the PICMs would remedy Plaintiff's and its members' injuries.

## VI.    CAUSES OF ACTION

### COUNT 1: FEMA'S APA Violation
### The PICMs and the De Facto Amendment Violate the Rulemaking Procedures
### of the APA

115.    Plaintiff incorporates by reference all preceding paragraphs.

116.    The APA defines rulemaking as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). The APA requires agencies to provide notice and comment opportunities before promulgating rules. *Id.* § 553(b), (c).

117.    In an effort to provide itself with authority to implement the PICMs, FEMA has adopted the De Facto Amendment. Through this adoption and application of the De Facto Amendment, FEMA imposed new legal obligations on NFIP-participating communities and floodplain development applicants.

118.    The De Facto Amendment and PICMs are legislative rules because they amend an existing legislative rule, alter the NFIP's requirements, and imposes new legal obligations with substantial effects on local communities and floodplain development applicants. As legislative rules, the PICMs and the De Facto Amendment are subject to APA Section 553. Contrary to the

APA, FEMA has not provided notice or opportunity to comment on either the PICMs or the De Facto Amendment.

119.    FEMA's failure to provide for notice and comment prior to adopting the PICMs or De Facto Amendment deprived Plaintiff and its members of their right to comment on and inform the outcome of the rulemaking.

120.    FEMA's failure to follow notice and comment rulemaking procedures as required by 5 U.S.C. § 553 constitutes unlawful agency action without observance of required procedures under 5 U.S.C. § 706(2)(A), (D) and under its own rulemaking regulations at 44 C.F.R. pt. 1.

## COUNT 2: FEMA's APA Violation
### Violation of the Administrative Procedure Act through Ultra Vires Conduct Not Authorized by Congress in the NFIA

121.    Plaintiff incorporates by reference all preceding paragraphs.

122.    FEMA may only exercise authority conferred by statute.  *See City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

123.    The NFIA provides no authority to the Administrator to impose conditions related to the protection of federally listed species.

124.    Accordingly, FEMA's imposition of ESA-based requirements through the implementation of the PICMs on NFIP-participating communities and floodplain development applicants exceeds its authority.

## COUNT 3: FEMA's APA Violation
### The PICMs and the De Facto Amendment Are Arbitrary and Capricious

125.    Plaintiff incorporates by reference all preceding paragraphs.

126.    FEMA's decisions to impose the PICMs and the De Facto Amendment are arbitrary and capricious, an abuse of discretion or otherwise not in accordance with the law as these

decisions were done without observance of proper procedures, violate substantive laws and regulations, and exceed FEMA's authority.

127.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA's PICMs and De Facto Amendment are arbitrary and capricious as well as an injunction preventing those conditions from going into effect.

## COUNT 4: FEMA'S NEPA Violation
### Failure to Analyze Environmental Impacts and Consider All Reasonable Alternatives

128.    Plaintiff incorporates by reference all preceding paragraphs.

129.    FEMA is a federal agency subject to NEPA, 42 U.S.C. §§ 4321-4370m-12.

130.    FEMA's implementation of the PICMs constitutes a major federal action significantly affecting the quality of the human environment.

131.    FEMA's implementation of its De Facto Amendment constitutes a major federal action significantly affecting the quality of the human environment.

132.    FEMA is required to complete review under NEPA prior to implementing any portion of the RPA, its De Facto Amendment, or the PICMs.  In violation of NEPA, FEMA has not prepared an EIS, finding of no significant impact, EA, or categorical exclusion prior to implementing the PICMs or its De Facto Amendment.  This constitutes unlawful agency action without observing required procedures under 5 U.S.C. § 706(2)(A), (D).

133.    In failing to conduct or complete the required environmental review, FEMA failed to consider and evaluate a reasonable range of alternatives other than the PICMs or the De Facto Amendment.  That error was arbitrary, capricious, and contrary to NEPA and its implementing regulations.  42 U.S.C. § 4332(2); 40 C.F.R. §§ 1502.14, 1508.9(b).

## COUNT 5: NMFS's ESA and APA Violations
### Incorrect Scope of FEMA's Action

134.    Plaintiff incorporates by reference all preceding paragraphs.

135.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS mischaracterizes the scope of FEMA's action under the NFIP subject to ESA Section 7 consultation.  As one example, NMFS failed to consider the floodplain development regulations adopted by NFIP-participating communities to participate in the NFIP and which are thereafter enforced by FEMA as conditions of their participation in the NFIP.

136.    This error is not in accordance with and violates 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(g)-(h).  This error constitutes a violation of the APA because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## COUNT 6: NMFS's ESA and APA Violations
### Incorrect Baseline

137.    Plaintiff incorporates by reference all preceding paragraphs.

138.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS did not consider all relevant factors in the environmental baseline.  50 C.F.R. § 402.02.

139.    This error is not in accordance with and violates 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(g)-(h).  This error constitutes a violation of the APA because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## COUNT 7:  NMFS's ESA and APA Violations
### Flawed Effects Analysis

140.    Plaintiff incorporates by reference all preceding paragraphs.

141.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or

adversely modifies critical habitat of 16 anadromous fish species, NMFS relied on an incorrect environmental baseline in its effects analysis.

142.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to isolate the impacts of the NFIP from pre-existing impacts or improbable future impacts.

143.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to use the best scientific and commercial data available and failed to give appropriate consideration to beneficial actions taken by FEMA, NFIP-participating communities, or others.

144.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to differentiate between the direct and indirect effects of the NFIP, and consequently included in its analysis indirect effects that are not reasonably certain to occur.

145.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS included the effects of private floodplain development both as an effect of the NFIP and as "cumulative effects," thereby "double counting" the effects of private floodplain development in its effects analysis.  Further, in considering private floodplain development as a "cumulative effect," NMFS failed to limit its analysis of cumulative effects to those that are reasonably certain to occur.

146.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to provide any reasonable basis for the Biological Opinion's conclusion that FEMA's implementation of the NFIP in Oregon is likely to cause particular impacts to the listed species or designated critical habitat.

147.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to include a reasonable basis for the Biological Opinion's conclusion that FEMA's implementation of the NFIP causes jeopardy.  In particular, it failed to identify the magnitude of any loss or degradation of aquatic systems, the species populations' ability to tolerate any such impacts, or how any impacts will considerably or materially reduce the likelihood of survival or recovery.

148.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to provide a reasonable basis for the Biological Opinion's conclusion that FEMA's implementation of the NFIP destroys or adversely modifies critical habitat because the evidence does not demonstrate that any adverse effects will "considerably reduce" the value of critical habitat.

149.    These errors violate 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(g)-(h).  These errors constitute violations of the APA because they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

### COUNT 8:  NMFS's ESA and APA Violations
### The RPA Is Arbitrary and Capricious and Otherwise Not in Accordance with the Law

150.    Plaintiff incorporates by reference all preceding paragraphs.

151.    NMFS's regulations require that RPAs must be implemented in a manner consistent with the intended purpose of the action, be within the scope of the action agency's legal authority and jurisdiction, be economically and technologically feasible, and must avoid the jeopardy to the ESA-listed species or destruction or adverse modification of critical habitat.  50 C.F.R. § 402.02. NMFS's RPA as set forth in the Biological Opinion is arbitrary and capricious and not in accordance with 50 C.F.R. § 402.02.

152.    In developing and describing the RPA, NMFS sought to impose on FEMA requirements that exceed FEMA's legal authority and jurisdiction.

153.    In developing and describing the RPA, NMFS failed to analyze whether the RPA is in fact economically or technologically feasible based on the actual costs to FEMA of implementing the RPA or FEMA's ability to bear those costs.

154.    In developing and describing the RPA, NMFS failed to conduct any analysis regarding whether the RPA is in fact economically or technologically feasible for the NFIP-participating communities burdened with implementing it or with their legal authority to implement.

155.    In developing and describing the RPA, NMFS failed to provide reasonable support demonstrating that the RPA would avoid jeopardy of the species or destruction or adverse modification of critical habitat.

156.    These errors violate 16 U.S.C. § 1536(a)(2) and 50 C.F.R. §§ 402.02 and 402.14(g)(8).  These errors constitute violations of the APA because they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

### COUNT 9: FEMA's Violation of the Spending Clause

157.    Plaintiff incorporates by reference all preceding paragraphs.

158.    Congress could not have authorized the ESA-related PICM conditions attached to participation in the NFIP because they do not satisfy the Spending Clause of the Constitution.

159.    First, the PICMs are not "reasonably related" or "germane" to the federal interest that underlies the NFIP.  *See South Dakota*, 483 U.S. at 207-08 & n.3 (1987) (conditions must be "reasonably related," or "germane[]," to the particular program); *see also New York v. United States*, 505 U.S. 144, 167 (1992) (the attached "conditions must . . . bear some relationship to the purpose of the federal spending") (citation omitted).  The PICMs concern federal endangered species protection, not protection of life and property from floodplain hazards.

160.    The PICMs threaten the federal interest that underlies the NFIP.  They undermine Congress' goals of dispersing funds related to disaster relief and recovery, sustainable floodplain development, and respecting local land-use decisions.

161.    Second, when the federal government provides funds conditioned on the recipient meeting certain conditions, it violates the Spending Clause if the recipient cannot be said to have "voluntarily and knowingly" accepted the terms, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), or if the funding regime gives the State no choice but to accept, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2022).

162.    The federal government provides funds to Plaintiff's members through the NFIP in exchange for their adoption of mitigation measures and implementing floodplain management protocols.  42 U.S.C. § 4022; 44 C.F.R. § 59.22. FEMA conditions participation in the NFIP on communities meeting basic requirements, including elevating structures and imposing regulations. It incentivizes communities to undertake these measures by offering them affordable flood insurance and availability of disaster relief.  FEMA can suspend communities from access to federal flood insurance, and deny them funds, if they do not adhere to these requirements.

163.    Here, NFIP-participating communities cannot be said to have had knowingly and voluntarily accepted the terms of the PICMs—they have no choice but to accept these terms.

164.    NFIP-participating communities' economies and infrastructures are too dependent on the benefits of the NFIP to withdraw from the program to avoid the requirements of the PICMs. Without these grants, the communities would not have the resources to protect against flooding. These communities are now forced to accept the PICMs or else forego the benefits of the NFIP.

165.    Third, because the PICMs are an unconstitutional usurpation of power reserved to the states in contravention of the Tenth Amendment, the PICMs induce unconstitutional action thereby running afoul of the Spending Clause. *South Dakota*, 483 U.S. at 207-08.

166.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the PICMs violate the Constitution's Spending Clause as well as an injunction preventing those conditions from going into effect.

## COUNT 10: FEMA's Violation of the Tenth Amendment

167.    Plaintiff incorporates by reference all preceding paragraphs.

168.    The Tenth Amendment prohibits the federal government from "requir[ing]" states and localities "to govern according to Congress' instructions," *New York*, 505 U.S. at 162, and from "command[ing] the States' officers . . . to administer or enforce a federal regulatory program," *Printz*, 521 U.S. at 935.

169.    Federal governments may not "forc[e] state governments to absorb the financial burden of implementing a federal regulatory program" or to put them "in the position of taking the blame for its burdensomeness and for its defects." *Id.* at 930.

170.    The PICMs thrust the obligations of the ESA upon NFIP-participating communities. As a result, these communities' personnel are "commandeered" to perform federal functions rather than local obligations in violation of the Tenth Amendment.

171.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the PICMs violate the Constitution's Tenth Amendment as well as an injunction preventing those conditions from going into effect.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment providing the following relief:

1.    Order and declare that FEMA is in violation of the APA because FEMA issued legislative rules without abiding by the notice and comment requirements of the APA Section 553;

2.    Order and declare that FEMA is in violation of the APA because its actions are ultra vires and not within its authority conferred by the NFIA;

3.    Order and declare that FEMA is in violation of the APA because its actions are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law;

4.    Order and declare that FEMA is in violation of NEPA because FEMA is implementing the PICMs and the De Facto Amendment, both of which constitute a major federal action that will significantly impact the environment, without complying with NEPA;

5.    Order and declare that NMFS is in violation of the ESA and the APA because the Biological Opinion issued by NMFS relating to FEMA's implementation of the NFIP in Oregon violates the ESA and is arbitrary, capricious, and not in accordance with law, and that the RPA is not binding or otherwise effective;

6.    Order NMFS to withdraw the Biological Opinion and the RPA;

7.    Order and declare that FEMA's PICM violates the U.S. Constitution;

8.      Enjoin implementation of the Biological Opinion, the PICMs, and FEMA's De Facto Amendment until Defendants have demonstrated compliance with the NFIA, NEPA, the ESA, the APA, and the U.S. Constitution;

9.      Award Plaintiff its costs of litigation, including reasonable costs, expenses, disbursements, and reasonable attorneys' fees; and

10.     Grant Plaintiff such further and other relief as this court deems just and proper.


Dated this 6th day of January, 2025.


                              VAN NESS FELDMAN, LLP

                              /s/ *Molly Lawrence*
                              Molly Lawrence, WA Bar No. 28236
                                        D.D.C. Bar No. WA0003
                              Sophia E. Amberson, WA Bar No. 52528
                                        (*Pro Hac Vice Forthcoming*)
                              1191 Second Avenue
                              Suite 1800
                              Seattle, WA 98101
                              Tel.: 206.623.9372
                              Email: mol@vnf.com
                                        samberson@vnf.com

                              Tyson C. Kade, DC Bar No. 1018014
                              2000 Pennsylvania Avenue, NW
                              Suite 6000
                              Washington, DC 20006
                              Tel.: 202.298.1800
                              Email: tck@vnf.com

                              *Attorneys for Plaintiff*